**PAPILLON AIRWAYS, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 09–297T.

United States Court of Federal Claims.

June 5, 2012.

R. Glen Woods, Esquire, and Aaron R. Maurice, Esquire, Henderson, Nevada, attorney of record for the Plaintiff.

Michael James Ronickher, U.S. Department of Justice, Washington, D.C., attorney of record for the Defendant. With him on the briefs were John A. DiCicco, Principal Deputy Assistant Attorney General; David I. Pincus, Chief, Court of Federal Claims Section; and G. Robson Stewart, Assistant Chief, Court of Federal Claims Section.

John Bergen and Amelia Moorstein, Law Clerks.

## OPINION

BASKIR, Judge.

Plaintiff, Papillon Airways (Papillon), seeks a refund of $900 it paid in Federal Air Transportation Excise Tax pursuant to 26 U.S.C. § 4261, and to abate the remaining $7,741,569 the Internal Revenue Service (IRS) asserts it owes. It claims exemption from the excise tax as an air taxi under 26 U.S.C. § 4281.

Pursuant to the statute, Papillon is ineligible for the exemption if the carrier operated on an "established line" during the disputed period. The parties filed cross-motions for summary judgment pursuant to Rule 56 of

the Rules of the United States Court of Federal Claims (RCFC). **For the reasons stated below, we conclude that the plaintiff operated on an established line and was therefore not exempt from the Air Transportation Excise Tax.**

## BACKGROUND

### I. *Factual Overview*

The following facts are taken from the parties' filings. They are undisputed except where noted. Papillon is an aerial sightseeing company based in Arizona that primarily services international tourists interested in helicopter tours over the Grand Canyon area. It markets flights designed to showcase scenic views of the canyon as well as areas near Las Vegas, the Hoover Dam and portions of the Hualapai and Havasupai Indian Reservations. In connection with its flights, Papillon also offers tourist-related services such as horseback riding, hiking, picnics and river rafting bundled into travel packages. In total, Papillon promotes 46 of these packages as part of a "reliable product line" in order to simplify sales and marketing.

The majority of Papillon's tour sales are made through third-party vendors. Papillon employs a network of approximately 1,500 to 2,000 different vendors, including travel agencies, concierge desks, and online travel sites which are authorized to sell its tours directly to consumers. Papillon provides these vendors with brochures listing suggested retail rates and profit margins for its various products. These prices can be adjusted by the vendors to achieve their desired profit margin. The brochures also describe Papillon's tours and allow the vendors and customers to make the purchasing decision before contacting Papillon to finalize the sale and make the reservation. Promoting a consistent product line allows this process to run more smoothly because it allows vendors to sell tours without first verifying that Papillon will be able to accommodate the consumer's choice of route and connected services.

Papillon is cautious when it comes to expanding this product line. The creation of a new tour requires consideration of the price, insurance, logistics, reliability, popularity, and safety of any potential new route. Because of the complexity of this process, Papillon's packages include core tours which have not changed over the years. The basic tour options have been in place since 1990.

In addition to its tour business, Papillon also engages in specialized charter work, government contracting, and utility flights. These types of assignments differ from the "everyday products" and are handled through a separate Utility Division within Papillon. Though the parties agree that the Utility Division flights are not taxable under the Air Transportation Excise Tax, the fact that some non-standard charters are referred to this branch is notable.

Papillon is the largest helicopter company of its kind in the world. During the disputed period, its air tour business brought in a total revenue of $78,335,577. It has a fleet of over forty helicopters and 227 employees. Over the course of its business, Papillon has carried more than 4.5 million people over the Grand Canyon.

In order to accommodate this volume of customers, Papillon utilizes a computer generated "source board." The source board sets forth the most profitable schedule of flights Papillon can send out on any given day. Though the source board is not fixed, Papillon uses this information to coordinate its fleet and determine when to schedule customers' departure times. Once a customer has decided on a product, they call Papillon to request a reservation. However, this request is for an approximate time of departure; the final time is set by Papillon after consulting the source board.

Customers do not typically pay Papillon for their flights directly. Instead, customers pay the vendor and are given a flight voucher to redeem at the terminal and Papillon bills the vendor based on its flight record. These authorized vendors consummate the initial sale of transportation. During a typical day, Papillon may fly on average 113 flights.

### II. *Procedural History*

On October 10, 2007, the IRS issued an examination report asserting that Papillon

owed $6,452,094.00 in back taxes pursuant to 26 U.S.C. § 4261 and $1,290,375 in negligence penalties under 26 U.S.C. § 6662 for the period between July 1, 2003 and September 30, 2005. The report found that Papillon had been operating its flights on an "established line" and was therefore responsible for the Air Transportation Excise Tax instead of the Aviation Fuel Excise Tax it had been paying pursuant to 26 U.S.C. § 4041(c). Carriers are only responsible for one of these two taxes, so the IRS deducted the amount paid in Aviation Fuel Excise Tax from the outstanding deficit it maintained Papillon owed in Air Transportation Excise Tax and assessed $6,452,094 in back taxes.

Papillon contested this characterization of their business and the accompanying increased tax rate and appealed the preliminary assessment to the IRS Appeals Office on November 9, 2007. On September 4, 2008, the Appeals Office notified Papillon that a final assessment of the Air Transportation Excise Tax was pending. Subsequently, Papillon attempted to pay the $900 under protest but failed to receive confirmation that the IRS had received its payment. It was eventually successful in making payment on December 30, 2008. On January 9, 2009, Papillon resubmitted a Form 8849 Claim for Refund which was denied on May 6, 2009.

In response, the plaintiff filed its complaint on May 11, 2009. On November 9, 2009 defendant filed an answer as well as a counterclaim for the taxes it asserts continue to be outstanding. This counterclaim was answered on November 25, 2009, and after a series of status conferences, plaintiff filed a motion for summary judgment on April 11, 2010. On July 27, 2011, the defendant filed a cross-motion and response to plaintiff's motion for summary judgment. Oral Argument was held on January 26, 2012.

## DISCUSSION

### I. *Applicable Legal Standards*

■ This court possesses jurisdiction over suits to obtain a refund of federal taxes pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000). *See also* 28 U.S.C. § 1346(a)(1) (2000). As a jurisdictional pre-requisite, the taxpayer must have paid the taxes in full and filed a refund claim with the IRS that complied with the pertinent laws and regulations. *Shore v. United States,* 9 F.3d 1524, 1526 (Fed.Cir.1993); 26 U.S.C. § 7422(a) (2000).

■ Given that the plaintiffs have exhausted all of the avenues available to them before the IRS, our review of the matter is *de novo. George E. Warren Corp. v. United States,* 141 F.Supp. 935, 940 (Ct.Cl.1956). Plaintiffs bear the burden of proving that the tax assessed was incorrect. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935). They must also establish the amounts which they are entitled to recover. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

We are currently resolving cross-motions for summary judgment. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 670 (1997). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

As the Consolidated Statement of Uncontroverted Facts reflects, there are no material facts in dispute in this case. The parties agree that their motions turn on a legal question: whether Papillon was operated on an "established line" within the meaning of § 4281.

### II. *Qualification for the Air Transportation Excise Tax's Exemption*

■ The Air Transportation Excise Tax under 26 U.S.C. § 4261 taxes segments of domestic air travel. It places the responsibility to collect these taxes on the travel providers if the tax is not collected by the party making the initial sale. However, providers are exempt from the tax if their aircraft weigh in at 6,000 pounds or less and they are not "operated on an established line." § 4281. The meaning of the term "established line" is the primary issue in this

case. This case and *Sundance Helicopters, Inc. v. United States,* 104 Fed.Cl. 1 (2012) are the only cases in this Court to address this issue.

Our starting point is the applicable Treasury Regulation, which states:

> [the] term "operated on an established line" means operated with *some degree of regularity between definite points.* It does not necessarily mean that strict regularity of schedule is maintained; that the full run is always made; that a particular route is followed; or that intermediate stops are restricted. The term implies that the person rendering the service *maintains and exercises control* over the direction, route, time, number of passengers carried, etc.

Treas. Reg. § 49.4263–5(c) (emphasis added). This provides us with three factors to consider; whether Papillon's business was (i) operated with some degree of regularity, (ii) between definite points, and (iii) with the requisite control retained by Papillon. We address each factor, in turn.

### A. *Some Degree of Regularity*

The first factor we must consider is whether the operator conducted its flights with "some degree of regularity." Treas. Reg. § 49.4263–5(c). We look to the positions the parties have advocated as well as the analysis other courts have undertaken for guidance in interpreting this phrase.

Papillon's position is that a schedule is strictly required for an operator to have conducted business with "some degree of regularity." Under this view, unless a provider maintains a fixed schedule, no volume of flights or customers could ever rise to the level of operating with some degree of regularity. In support of this theory, Papillon points to Revenue Ruling 66–301, which provides that "[a] schedule other than customer demands is necessary if the operation is to be conducted with 'some degree of regularity.'" Rev.Rul. 66–301.

However, Revenue Ruling 66–301 dealt with the unusual case of a helicopter company that operated 10 days out of the year in conjunction with a local fair. The provider was a "walk-up business" and did not permit advance booking. *Id.* The facts considered in the Revenue Ruling are distinguishable from those the instant case and, as a revenue ruling, its persuasive value is limited. Ultimately, it is the treatment other courts have given this issue when faced with similar facts that we find most persuasive.

In *Lake Mead Air, Inc. v. United States,* 991 F.Supp. 1209 (D.Nev.1997), a Nevada District Court held a fixed-wing airplane service that flew standardized, twice-daily scenic tours over the Grand Canyon was operated with "some degree of regularity" and ultimately on an established line. The court reached this conclusion by contrasting that case with a revenue ruling addressing an airline contracted to deliver mail for the United States Postal Service. Rev.Rul. 72–617. That ruling applied a "but for" test and determined that the airline was not operated on an established line because it would not have flown that particular route "but for" the contract with the Postal Service. *Id.* Conversely, the court determined Lake Mead was operated with some degree of regularity because the airline flew over the Grand Canyon regularly and would still have flown the route "but for" a single customer's business. *Lake Mead,* 991 F.Supp. at 1213. Although plaintiff correctly points out that the operator in *Lake Mead* flew at more regular intervals, the deciding inquiry is the court's "but for" analysis. *Id.* at 1210 (describing the limited choices customers had between the morning, afternoon and mixed land and air tours).

The District Court also observed that the "crux" of the regularity factor is "that the public can rely on the transportation." We agree that this consideration is central to the regularity factor. If we adopt a strict, fixed-schedule requirement as Papillon requests, no amount of volume or activity level by a carrier could ever constitute an established line. Even if a provider dispatched flights each day leaving every minute, on the minute, a court would be required to find that customers could not have relied on that provider for transportation under such a test. We adopt the district court's analysis on this point and therefore must reject the plaintiff's argument.

Similarly, in *Temsco Helicopters Inc. v. United States,* 409 Fed.Appx. 64 (2010), the Ninth Circuit Court of Appeals found in an unpublished opinion that scenic helicopter tours in Alaska were operated with some degree of regularity and on an established line. The court came to this finding despite the fact that Temsco did not maintain a schedule, noting that "'strict regularity of schedule' is not required." *Id.* at 66. Instead of requiring a schedule, the court looked to the reality of situation—that the provider in *Temsco* was operating regularly and could be relied upon by consumers. *Id.* (disclaiming a schedule requirement in lieu of examining the operator's actual practices).

In *Schuman Aviation Co. v. United States,* the District Court of Hawaii found that a helicopter tourism provider operating without a schedule still met the "some degree of regularity" requirement. *Schuman Aviation v. United States,* 816 F.Supp.2d 941 (D.Hawai'i 2011). The court expounded that "[i]n keeping with relevant authority, this court looks at the *actual practice* of the transporter to determine whether the transportation was operated with some degree of regularity." *Id.* at 954 (emphasis added). The court continued:

> The court agrees that operating a substantial number of flights does not, standing alone, establish that the flights are operated regularly such that they constitute an established line. A popular taxi service might make many trips on a given day. What the regulation gives significance to is rather the degree of regularity between definite points.

*Id.* This approach reads the "some degree of regularity" factor in its appropriate context. The relevant consideration is whether it was the actual practice of the transportation provider to operate with some degree of regularity between definite points. A schedule is not required.

The Court in *Sundance Helicopters* agreed that "if a plaintiff's tours operate in a discernable pattern, amounting to a level such that the public could rely on for transportation, plaintiff satisfies the regularity element." *Sundance Helicopters,* 104 Fed.Cl. at 8. It concluded that plaintiff's helicopter tour service satisfied this requirement because there was a "discernable pattern of the same tours being flown at approximately the same time every day" and "a potential customer could have said at the time with a high degree of certainty that plaintiff will fly a Grand Canyon Picnic tour mid-morning and a Sunset tour mid-afternoon." *Id.*

We also decline to adopt a strict schedule requirement. The reasoning set out in these cases provides a common-sense interpretation of the "some degree of regularity" factor. If instead we enforced a strict schedule requirement, it would run aground of the plain language meaning of Treas. Reg. § 49.4263–5(c). It would require us to read the phrase "some degree of regularity" to mean "scheduled." However, this is at odds with the regulation's deliberately forgiving choice of words. If the Treasury regulation's drafters had intended to implement a scheduling requirement, they could have employed explicit language to do so.

The next logical step is to examine Papillon's actual practices and whether customers could rely on Papillon's flights. Papillon flew an average of 113 flights per day during the disputed period. Transcript of Oral Argument ("Tr.") at 18, 21. Although Plaintiff's counsel took issue with this approach, arguing that this court should not consider the average number of flights, a review of the record reveals that Papillon operated a sizable number of flights per day and never failed to operate. Def. Ex. 18. Also, it is worth noting that Papillon is the largest helicopter company of its kind in the world and has a fleet of over 40 helicopters, most of which are dedicated to its charter operations. CSUF ¶ 7. In fact, the record reveals that the magnitude of Papillon's operation dwarfs those of the operators in *Lake Mead, Temsco* and *Schuman,* all of which were found to operate on an established line and with some degree of regularity. Indeed, the *Schuman* court found an airline operating "more than six times each day" met this burden. *Schuman,* 816 F.Supp.2d at 954. We also find it difficult to see how a customer could not rely on Papillon given this volume of flights.

In order to accommodate this volume, Papillon employed a "source board." The

source board was a reference tool for Papillon to determine the most profitable potential flight times. It was formulated each day based on historical data of consumer demand, weather and other considerations. Although as Plaintiff points out the schedule was not fixed, the source board was consulted during the back and forth of the booking process. That process, described as a "dialogue" by Papillon's employee, involves dickering over acceptable times and juggling the various passengers and flights. Def. Ex. 22 at 313–317. Customers do not simply call Papillon and inform them of their departure time. Instead, Papillon employs the source board as a tool to determine whether it can reach a compromise with the aim of fitting customers into the optimum time slots.

The source board is designed not just to steer customers into these time slots but to ensure Papillon has available helicopters at these times. For example, sunset trips are often in high demand so Papillon attempts to schedule its helicopters so they will be available at that time. Papillon does this maneuvering so that it will be able to provide a reliable stream of flights during its high demand time periods. Thus, employing the source board as a scheduling tool results in something resembling regularly scheduled service which customers can rely on for these high demand periods. This pattern of flights bears out the government's theory that Papillon's actual practices are operated with some degree of regularity.

However, Papillon argues that its flight certificate proves its actual practices cannot satisfy the "some degree of regularity" factor. Papillon operates pursuant to a certificate issued by the Federal Aviation Authority ("FAA") under Part 135 of its regulations. This certificate only authorizes Papillon to undertake unscheduled flights with one exception. That scheduled flight is flown once daily between the Grand Canyon Airport and the Havasupai Indian Reservation under their A018 certificate and is not at issue here. In order to conduct additional scheduled flights, a commuter certification under Part 121 is required by the FAA. Papillon contends that because their Part 135 "air taxi" certificate does not allow them to conduct

such scheduled flights, they could not have been operating with "some degree of regularity" nor could they have been operating on an established line during the disputed period.

Ultimately though, it is the Treasury's, not the FAA's, classification that decides whether Papillon was being operated on an established line. While the FAA's determination regarding the degree of regularity is relevant evidence, the applicable Treasury Regulation provides us with a framework for making this determination. We are tasked with applying these elements to Papillon's actions during the disputed period, not merely accepting the FAA's classification.

Additionally, it is not clear that the FAA's prohibition on scheduled operations impacts whether Papillon was operated with "some degree of regularity" or on an established line. Papillon has not made any showing of a nexus or overlap between these two classifications. In order for Papillon's FAA certificate to be dispositive, operation on an established line must require the strict-scheduling the FAA certificate prohibits. Because we decline to adopt a requirement that a strict-schedule is necessary for a provider to have been operating on an established line, evidence that Papillon could not have been operating under a strict-schedule, like their FAA certificate, loses its luster. Papillon's air certificate is a considerable factor in Papillon's favor but does not decide the issue.

Papillon facilitates a high volume of flights each day. This volume, combined with Papillon's use of the source board, results in a service customers can rely upon. Considered in light of the low number of flights other courts have found can constitute "some degree of regularity," we are persuaded that Papillon operated on an established line.

B. *Between Definite Points*

Papillon makes a plain meaning argument with respect to the clause "between definite points." In its view, the use of the terms "between" and "points" precludes taxation under 26 U.S.C. § 4261 because the flights depart and land at the same point—Papillon's helipads. It stresses that our reading should put emphasis on these two words and

we should interpret the phrase as essentially meaning "between two separate points."

Papillon also criticizes the reliance—by Defendant as well as the various district courts which have reviewed this issue—on Treasury Regulation § 49.4261–1(c). Papillon points out that section 49.4261–1(c) applies to general tax transportation issues. It contends that this provision has no application to analysis of the "between definite points" test. It also draws attention to the wording of section 49.4261–1(c), which it says directly contradicts the "between definite points" language of section 49.4263–5:

> It is not necessary that the transportation be between two definite points. If not otherwise exempt, a payment for continuous transportation beginning and ending at the same point is subject to the tax.

Treas. Reg. § 49.4261–1(c). Papillon argues that it would be illogical to use section 49.4261–1(c) to interpret this clause instead of the more specific regulation for small aircraft in section 49.4263–5. Without reaching this question, we find that a reading of "between definite points," supports the idea that flights departing and landing at the same or close to identical points can satisfy the requirement.

An examination of the statutory history of the language "between definite points" is particularly revealing. The phrase originated in the tax exemption for conventional taxi cabs. Internal Revenue Code of 1939, § 3469(a) (26 U.S.C. § 1940 ed. Supp. I) ("IRC" or "Code"). Contemporaneous House and Senate committee reports referred to the purpose of the air taxi exemption as leveling the playing field between the two types of transportation. These reports stated the purpose of the new exemption was "[t]o provide equality of treatment for the two types of taxi transportation and to remove an unwarranted burden on this new, small industry." H.R.Rep. No. 85–481, at 48–49 (1957). It was with knowledge of this existing taxi cab exemption that Congress chose to employ the "between definite points" phrase in the air taxi exemption. As *Temsco* noted, "Congress is presumed to have known of case law, regulations, and rulings construing the prior statute and to

have intended § 4281 to be construed in the same manner." *Temsco,* 409 Fed.Appx. at 66.

With this in mind, the meaning of the "between definite points" requirement becomes much clearer. A conventional taxi cab has, at most, one definite point—the location it picks up its customer. As the customer engages the cab, its destination—the second point—generally remains indefinite and unknown. A Ninth Circuit Court of Appeals case, *Gray Line Co. v. Granquist,* bears this understanding out. *Gray Line Co. v. Granquist,* 237 F.2d 390 (9th Cir.1956). In Gray Line, the court found a limousine service was operated on an established line because it transported people between two designated points—Portland and two of its airports. Without an indefinite destination, even though Gray Line was taxiing people back and forth, the court found it was not eligible for the taxi cab exemption. When an operator is transporting customers between two known or definite points the nature of their business is closer to bussing than taxiing.

Placed in historical context, the term "between definite points" is meant to ensure providers offering transportation between *definite* points are not exempt from the tax. The taxi cab exemption likely never considered the situation in which a taxi would not have multiple points, for example, taking the customer on a loop and returning to its point of origination. If we accept Plaintiff's conclusion, an established line operator, such as Gray Line, might avoid taxation by merely driving a loop. It would be bizarre to exempt an otherwise taxable operator under taxi status because they drive or fly in a loop instead of from point A to B. Exempting flights for this reason would create a tax loophole.

A more logical reading of this phrase places the emphasis on the term "definite" and allows any operator between a definite point(s) to be operating on an established line. All four of the other courts which have addressed this issue unanimously conclude that flights of this type can be operated on an established line. For the reasons cited in those opinions and the basis discussed above, we conclude that Papillon was operated "be-

tween definite points" within the meaning of Treasury Regulation § 49.4263–5(c).

### C. *Operated with the Required Degree of Control*

The Treasury Regulation compels us to consider whether "the person rendering the service maintains and exercises control over the direction, route, time, number of passengers carried, etc." to determine if a provider operates on an established line. Treas. Reg. § 49.4263–5(c). The *Lake Mead* court found a refusal to fly over a portion of the Grand Canyon showed that Lake Mead had not ceded the "absolute control" required by the exemption. *Lake Mead*, 991 F.Supp. at 1212–1213. That court took the position that reserving any significant control over the aircraft is sufficient for the regulation. A similar standard was implied in *Temsco:*

> Contrary to Taxpayer's contention, being contracted to provide particular tours does not preclude Taxpayer from satisfying the control element. Taxpayer still decides what tours to offer, when to schedule flights, the route to take, and where to land. It also decides the maximum number of passengers allowed and whether to cancel a flight for insufficient sales.

*Temsco*, 409 Fed.Appx. at 67. All of the factors discussed in *Temsco* are present in this case. The *Schuman* court also made a finding of control despite the fact that the provider allowed for midair route adjustments. The retention of any meaningful degree of control is sufficient to satisfy this factor.

Papillon exercises a great deal of control over how its flights are conducted. Its "off the shelf" sales approach results in tours that are carefully vetted and planned. Def. Ex. 27 Langness at 391–393. When customers seek to deviate from these set tours they are referred to the Utility Division. Def. Ex. 32 Wuster at 439–440. Papillon maintains control over the distribution and number of passengers on each flight. Papillon decides when the flights will take off, notifying customers of their departure time 24 hours in advance. Def. Ex. 13 Graff at 313–315; Def. Ex. 27 Langness at 385. In short, Papillon reserves the same right of refusal *Lake*

*Mead* found sufficient for control because it does not cede absolute control to the customer. Instead of accepting customer requests, they work with customers through a dialogue to negotiate compromises both parties find acceptable. We find Papillon retains the requisite amount of control.

In sum, to exclude Papillon from the § 4281 exemption the Treasury Regulation's factors must point toward a finding that it operated on an established line. After examining the record, we determine that all three of these factors indicate Papillon was operated on an established line during the disputed period. The Court in *Sundance Helicopters* came to a similar conclusion that *Schuman, Lake Mead,* and *Temsco* correctly interpreted the established line exemption in their examination of the regularity, "between definite points," and control requirements. *Sundance Helicopters*, 104 Fed.Cl. at 7. Consequently, Papillon was not eligible for the exemption.

### III. *Plaintiff's Statutory Argument on the Exemption*

Papillon argues that the government's position in this case will essentially read the § 4281 exemption out of the statute. They claim that adopting this reading creates an impossibly high barrier to attaining the air taxi exemption. In their words, "an on demand 'air taxi' cannot simply travel the skies looking for fares (the days of Jetsons-like travel are still science fiction)." Pl. Res. at 19.

However, this argument ignores the relevance of Papillon's Utility Division. When customers request flights that deviate significantly from the "everyday products" Papillon offers, they are referred to the Utility Division. Def. Ex. 30 at E–415. These flights differ from the standard product line and more closely resemble the on-demand charters Treasury Regulation § 49.4263–5(c) contemplates. *See* CSUF ¶ 73. This division, which both parties agree is not taxable, rebuts Papillon's argument because it provides an exempt group of flights without requiring the operator to "travel the skies looking for fares." The government's interpretation of Treasury Regulation § 49.4263–5(c) puts

forth a three factor framework that leaves ample room to find the exemption short of the Jetsons' circumstances. Papillon's Utility Division, which does not operate with some degree of regularity or between definite points, bears this out.

## IV. Responsibility for Collecting the Tax

█ Finally, Papillon argues that even if it was not eligible for exemption under § 4281, and therefore subject to the tax, it was not responsible for the tax's collection. It contends that it was only secondarily liable for the tax and the government did not discharge its obligation to seek recompense from the parties with primary liability. We look to the tax and its recent legislative history for guidance.

The Air Transportation Excise Tax is one of a group of excise taxes imposed under 26 U.S.C.A. § 4261. These taxes are assessed to the person making the payment subject to the tax. Here, this is the customer purchasing Papillon's flights. The provider of the transportation is then required to collect and remit these taxes to the government.

Formerly, under § 4291, transportation providers were only indirectly liable for the tax through a provision assessing them a penalty of 100% of the taxes they failed to collect. In 1997, however, Congress amended § 4263(c) to create direct liability. That provision now states:

> (c) Payment of Tax.—*Where any tax imposed by section 4261 is not paid at the time payment for transportation is made,* then, under regulations prescribed by the Secretary, to the extent such tax is not collected under any other provision of this subchapter, *such tax shall be paid by the carrier providing the initial segment of such transportation which begins or ends in the United States.*

§ 4263(c) (emphasis added). A straightforward reading of this amendment imposes liability for collecting and remitting the tax on carriers if the initial seller fails to collect it.

Papillon points to Senate and House reports that refer to this added liability as "secondary." They argue Congress employed this term as a legal term of art, requiring the IRS to first pursue the primarily liable party. Accordingly, they argue that the IRS could not turn to Papillon without having first attempted collect the tax from the vendors who made the initial sales.

However, despite the use of the term secondary liability in the aforementioned reports, ultimately the meaning of § 4263(c) is clear and unambiguous. The provision imposes liability on air carriers "[w]here any tax imposed by section 4261 is not paid at the time payment for transportation is made." Notably, § 4263(c)'s terms make the carrier's liability conditional on *whether the tax was collected* at the time payment for transportation was made, *not whether the government is unsuccessful at collecting the tax.* This does not comport with the implication Papillon has drawn from the legislative history. Because we do not find ambiguity in the terms of § 4263(c), we decline to look past the clear, straightforward meaning of the provision. Both the *Schuman and Temsco* decisions support this understanding. *Schuman,* 816 F.Supp.2d at 957; *Temsco,* 409 Fed.Appx. at 67. Accordingly, we find Papillon does not escape liability under the theory that it is merely secondarily liable.

Plaintiff also argues that the failure to prescribe the regulations mentioned in § 4263(c) alleviates their liability. However, as the *Temsco* court noted, "The language of the statute and its legislative history do not establish that regulations are a precondition to applying § 4263(c)." *Id.* at 67.

## V. Negligence Penalties

█ Papillon was assessed $1,290,375 in negligence penalties pursuant to 26 U.S.C. § 6662. This section imposes a 20 percent penalty on an underpayment due to "negligence or disregard of rules or regulations." 26 U.S.C. § 6662(b)(1).

In order to defeat this assessment, Plaintiff bears the burden of establishing a reasonable cause defense. *Conway v. United States,* 326 F.3d 1268, 1278 (Fed.Cir.2003). Once that defense is asserted, the court must evaluate it, considering whether there was a "lack of investigation, dependence on

**164**

unfounded assumptions or representations, conflict of interest, or the experience and knowledge of a taxpayer." *Stobie Creek Investments, LLC v. United States*, 82 Fed.Cl. 636, 710 (2008).

Papillon's reasonable cause defense consists of an affidavit from one of its employees, Lon Halvorson. In this affidavit, Mr. Halvorson attests to several reasons Papillon did not collect and remit the tax, including: a previous audit of Papillon, an audit of a competitor, Papillon's membership in several appropriate trade organizations and the advice of their counsel.

Despite these considerations, Papillon has not successfully carried the burden of establishing its reasonable cause defense. The *Lake Mead* decision in 1997 should have alerted Papillon to its potential liability. It has not presented significant proof of investigation into its potential liability. Seeking the advice of peer companies and legal counsel show some investigation but must be viewed in light of a potential conflict of interest, especially given its counsel's involvement in *Lake Mead*. On balance, Papillon has no reasonable cause defense and cannot escape liability for the negligence penalties.

## CONCLUSION

A review of Papillon's operations show that it operated on an established line and cannot be exempted from the Air Transportation Excise Tax under 26 U.S.C. § 4281. Moreover, Papillon has not established sufficient inquiry to avoid penalty for its negligence in failing to pay the tax. For these reasons, we **DENY Plaintiff's Motion for Summary Judgment and GRANT Defendant's Motion for Summary Judgment.** The Clerk's Office is directed to enter judgment for the Defendant. Parties shall bear their own costs.

IT IS SO ORDERED.